## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
Case No. _____

| | | |
|---|---|---|
| ANGELA D. HARRIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| SUN LIFE FINANCIAL (U.S.) SERVICES | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES Plaintiff ANGELA D. HARRIS, by and through her undersigned counsel, complaining of Defendant SUN LIFE FINANCIAL (U.S.) SERVICES COMPANY, INC., hereby alleges and says as follows:

## **PARTIES AND JURISDICTION**

1.     Angela D. Harris ("Angie") is a resident and citizen of Fuquay-Varina, Wake County, North Carolina, and of sound mind, under no mental or legal disability at all times relevant to this action

2.     Upon information and belief, Sun Life Financial (U.S.) Services Company, Inc. ("Sun Life") is and at all times relevant to this action, has been a Delaware corporation, with its principal place of business being Massachusetts, authorized to conduct the business of insurance in state of North Carolina.

3.     Sun Life sells and issues disability insurance policies throughout the state of North Carolina.

4.     Ward and Smith, P.A. employed Angie at the time the disability insurance policy in question came into dispute.

1

5.    Ward and Smith provided disability benefits to its employees under ERISA through Sun Life at all relevant times.

6.    Jurisdiction over Defendant is vested in this Court under ERISA § 514 and 28 U.S.C. § 1331.

7.    Venue for this case is proper under 28 U.S.C. § 1391.

## FACTS

8.    On July 16, 2012, Ward and Smith, P.A. hired Angie for the position of Director of Government and Media Relations.

9.    According to her job description, Angie acted as the "Firm's chief lobbyist for issues that involve the General Assembly and NC agencies, coordinates our federal programs, and is a key component of the Firm's business incentive and military-related economic development work."

10.    Ward and Smith offered its employees long-term disability insurance under an ERISA-governed employee benefit plan in 2016.

11.    Sun Life issued "Group Basic Long Term Disability Income Insurance" coverage to Ward and Smith and its employees under the Policy Number 242557-003 ("the Policy") that was effective from January 1, 2016, through December 31, 2016.

12.    The Policy covered Angie in 2016.

13.    On December 12, 2015, Angie began experiencing joint pain throughout her body from her neck to her ankles.

14.    On December 15, 2015, Angie saw her primary care provider, Dr. Conrad Flicker, of Family Medical Associates of Raleigh for these symptoms.

2

15.     Dr. Flick documented this joint pain that Angie suffered throughout her body, noting that the pain prevented her from sleeping. He did not diagnose a definitive cause of the pain, but he did prescribe her pain medication.

16.     On December 23, 2015, Angie saw Joan D. Britt, FNP, also of Family Medical Associates of Raleigh.

17.     FNP Britt noted that Angie still suffered joint pain and had found many ticks in her Christmas tree. FNP Britt prescribed Angie a 10-day course of an antibiotic, Doxycycline, as a treatment for possible exposure to Lyme Disease.

18.     On December 26, 2015, Angie suffered such pain that she went to the Rex Hospital emergency room ("Rex ER"). Angie received a shot of Decadron (dexamethasone), a steroid, and Dilaudid, a strong opioid pain medication, at Rex ER. The ER physician who saw Angie recommended that she see a rheumatologist.

19.     On January 4, 2016, Angie saw Dr. Flick at his office. Dr. Flick noted Angie's continued joint pain, and opined that her pain could be the result of a virus or connective tissue disease. Dr. Flick recommended that Angie see a neurologist for her migraine headaches.

20.     On January 16, 2016, Angie saw Dr. Louie Tsiktsiris at N.C. Arthritis & Allergy Care Center, P.A. per the recommendations of the Rex ER and Dr. Flick.

21.     Angie told Dr. Tsiktsiris that she had begun experiencing aches and pains 4 to 5 weeks prior and that she had pain "all over from my neck to my toes." Angie told Dr. Tsiktsiris that the pain was especially severe in her neck and shoulder regions.

22.     Dr. Tsiktsiris recorded that Angie had been taking liquid ibuprofen and 325 mg of hydrocodone per day, as prescribed by Dr. Flick.

23.     Dr. Tsiktsiris also noted that Angie had been suffering from deep bony aches, worsening fatigue, and a general malaise.

24.     Dr. Tsiktsiris recorded that Angie had a family history of osteoarthritis. He also observed bony hypertrophy on some of the fingers on Angie's right hand, consistent with osteoarthritis.

25.     Dr. Tsiktisiris ordered x-rays of Angie's back and neck, rheumatic testing, tests for inflammation, and thyroid testing. Dr. Tsiktisiris also prescribed a muscle relaxer, tizanidine.

26.     On January 6, 2016, Angie had x-rays taken of her cervical spine at Wake Radiology.

27.     Dr. Joseph Melamed interpreted the x-rays and observed that Angie had anterolisthesis of her C7 and T1 vertebrae, which is associated with facet osteoarthritis. Dr. Melamed also observed that Angie had disc space narrowing and anterior osteophyte formation at C5-6. Dr. Melamed also observed disc space narrowing and anterior lipping at C6-7.

28.     On January 7, 2016, Angie saw Dr. Melanie Tew at Wake Psychiatry. Dr. Tew noted that Angie was suffering from pain in her joints and associated immobility. When Dr. Tew had seen Angie 2 months earlier, she had not noted any similar complaints from Angie.

29.     On January 18, 2016, Angie returned to Dr. Tsiktisiris for a follow-up.

30.     Dr. Tsiktisiris diagnosed Angie with degenerative arthritis of the neck and muscle spasms. He ordered her to continue taking the prescribed tizanidine and referred her to Dr. Cara Siegel, a physiatrist at Raleigh Orthopaedic Clinic.

31.     On February 5, 2016, Angie saw Dr. Patricia Naslund at Raleigh Neurology Associates. Angie had previously seen Dr. Naslund for migraine treatment. However, at this visit

Dr. Naslund noted Angie's development of diffuse joint pain and noted "Complaints of joint pain, muscle stiffness." in her review of Angie's systems.

32.     On February 11, 2016, Angie saw Dr. Cara Siegel at Raleigh Orthopaedic.

33.     Dr. Siegel noted that Angie complained of neck and back pain that had begun without injury in December 2015. Dr. Siegel also noted that Angie complained of numbness on the entire left side of her body. Dr. Siegel recommended a home exercise regimen, physical therapy, and comprehensive pain management. Dr. Siegel also ordered MRI's of Angie's lumbar, cervical, and sacral spine.

34.     On February 22, 2016, Angie received an MRI of her cervical spine at Wake Radiology. The MRI results were interpreted by Dr. Philip Saba. Dr. Saba observed chronic degenerative disc space narrowing at C5-6 and C6-7 with disc protrusions at those levels.

35.     On February 23, 2016, Angie returned to Dr. Flick, still complaining of joint pain and pain in her back. Dr. Flick referred Angie to Wake Spine and Pain for further evaluation and treatment.

36.     On March 3, 2016, Angie saw Dr. Flick again. Dr. Flick noted that Angie was still suffering from back and joint pain. Dr. Flick noted that Angie's onset of pain and attempts to get diagnosis and treatment since December had caused her to use up all of her sick leave and vacation time due to inability to work because of her pain and going to doctors' appointments. Dr. Flick noted that Angie had come to seek his help with disability-related paperwork. Dr. Flick helped Angie with the paperwork and recommended that she see a neurologist.

37.     On March 14, 2016, Angie saw Jessica Eaton, PA at Rex Neurosurgery and Spine Specialists. PA Eaton noted that Angie was suffering from axial neck pain and lumbar pain radiating into her bilateral lower extremities. PA Eaton noted that Dr. Grant Buttram had reviewed

5

her MRIs and that together they had determined that Angie should receive physical therapy and be referred to Dr. Krishna Bhat for management of her pain.

38. On March 17, 2016, Angie saw Dr. Krishna Bhat at Wake Spine and Pain.

39. Dr. Bhat noted that Angie suffered pain in her left neck and bilateral lower back areas.

40. Dr. Bhat recommended physical therapy for Angie and told her to follow up in one month.

41. On March 18, 2016, Angie began physical therapy with Kathleen Durso, DPT at Pivot Physical Therapy. Ms. Durso observed that Angie was suffering from cervicalgia, low back pain, muscle weakness, and decreased range of motion. Ms. Durso recorded that Angie's neck pain ranged from 3 to 9 on a scale of 1-10. Ms. Durso also recorded that Angie's back pain ranged from 4 to 9 on a scale of 1-10. Ms. Durso performed stretches with Angie and discussed short and long-term goals with her.

42. Angie received aquatic and manual therapy at Pivot Physical Therapy from late March to mid-July: on March 21, 23, 28, and 30; April 1, 4, 6, 8, 11, 13, 15, 18, 20, 22, 27, 28, and 29; May 2, 4, 6, 10, 12, and 17; June 13, 23, and 27; and, July 8 and 20.

43. After 29 physical therapy visits, Ms. Durso noted that Angie still suffered from neck and lower back pain, which was severe enough on some days to prevent her from completing her daily activities.

44. On March 23, 2016, Dr. Bhat performed a facet injection on Angie's spine at the L5-S1 level.

45.     On April 4, 2016, Angie saw Dr. Bhat again at Wake Spine and Pain. Angie reported to Dr. Bhat that the facet injection relieved her pain by about 75%, but that the relief only lasted about a day.

46.     On April 7, 2016, Dr. Bhat performed an epidural steroid injection on Angie's spine at the C6-C7 level.

47.     On April 19, 2016, Angie saw Dr. Bhat again at Wake Spine and Pain. Dr. Bhat noted that Angie still suffered from dull, aching, and shooting/stabbing pain in her neck, and that the epidural steroid injection had provided only mild relief.

48.     On April 22, 2016 Dr. Bhat performed facet joint injections on the left side of Angie's spine at the C5, C6, and C7 levels.

49.     On April 29, 2016, Mary Harris, Ward and Smith's Payroll and Benefits Specialist, faxed a Long-Term Disability Claim Packet to Sun Life on Angie's behalf. The claim packet contained information about Angie's situation, including her start date of July 16, 2012, her last date worked of March 7, 2016, and that she ceased working due to "Serious Health Condition."

50.     The claim packet also included an attachment describing Angie's position with Ward and Smith, some of the Essential Job Functions listed include: "Manage relationships with state regulators and clients to ensure that the Firm's business interests receive consideration; Build and maintain productive working relationships on behalf of the Firm with relevant internal and external stakeholders to identify, anticipate, influence, and manage key issues; and, Identify, evaluate, secure and manage lobbyist and client relationships and demonstrate return on investment."

51.     The claim packet also listed one of the Essential Capabilities for the position as: "Ability to strategically network and relationship build to successfully execute duties."

52.     The job description also described the position's work environment, including the following: "Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions."

53.     The job description listed the physical demands required for the position as: "While performing the duties of this position, the employee is regularly required to walk, stand, stoop, kneel, and crouch, or sit for long periods of time…talk and hear, both in person and by telephone…The employee must regularly lift and/or move up to 10 pounds and occasionally lift and/or move up to 25 pounds."

54.     The claim packet also contained paystubs for Angie's earnings during the 6 months prior to her becoming disabled. Those paystubs showed her earnings as follows:

   a.   November 2015, Angie's pre-tax earnings were $13,750.00;

   b.   December 2015, Angie's pre-tax earnings were $14,291.20;

   c.   January 2016, Angie's pre-tax earnings were $12,916.67;

   d.   February 2016, Angie's pre-tax earnings were $12,916.67;

   e.   March 2016, Angie's pre-tax earnings were $12,916.67; and

   f.   April 2016, Angie's pre-tax earnings were $12,916.67.

55.     On May 6, 2016, Jennifer L. Gurganus, Senior Benefit Consultant II for Sun Life, sent Angie a letter. That letter listed items that Sun Life required Angie to produce under the Policy, as well as a paraphrased explanation of the determination process and the benefits available under the Policy.

56.     On May 11, 2016, Angie left a voicemail for Jennifer Gurganis in which she said that her claim was not just behavioral health-related, but that the stress of her job also exacerbates her physical issues.

57.     On May 13, 2016, Angie saw Dr. Bhat at Wake Spine and Pain. Dr. Bhat observed that Angie still experienced significant pain on the left side of her neck. He opined that the pain may be related to cervical facet arthropathy and proposed a series of two additional facet joint injections followed by radiofrequency nerve ablation.

58.     On May 18, 2016, Angie spoke to Jennifer Gurganus on the phone. Angie told Jennifer Gurganus that her neck was extremely painful and that just talking on the phone is a problem. When Jennifer Gurganis offered that someone could come to Angie's home to collect information about her claim, Angie accepted and agreed that this would be helpful.

59.     On May 23, 2016, Dr. Bhat performed a medial branch nerve block on the left side of Angie's spine at the C5, C6, and C7 levels.

60.     At that visit to Wake Spine and Pain, the staff measured Angie's blood pressure at 172/102.

61.     Angie was sent to the Rex Hospital ER due to her dangerously elevated blood pressure. ER doctor Amy de Stefano noted that in addition to high blood pressure Angie was suffering from cervical spine pain and low back pain. Dr. de Stefano opined that Angie's intense back and neck pain brought on the spike in her blood pressure.

62.     On May 31, 2016, Sun Life received a fax from Wake Spine and Pain consisting of an Attending Physician's Statement completed by Dr. Bhat.

63.     In his statement, Dr. Bhat wrote in the box entitled "Diagnosis including any complications: "Cervicalgia M54.2, Spondylosis without myelopathy or radiculopathy M47.812, Low back pain M54.5, spondylosis without myelopathy or radiculopathy lumbosacral region M47.8."

64.     In the box entitled "Objective findings/investigative testing (i.e., x-rays, EKGs, MRIs, laboratory data, etc.)," Dr. Bhat wrote: MRI Cervical – C4/5, C5/6 mild disc protrusions, osteophytes (2/22/16) MRI Lumbar – facet arthropathy (L5-S1)."

65.     In the box entitled "Subjective findings," Dr. Bhat wrote: "L neck pain, decreased ROM, low back pain, decreased ROM."

66.     Under the "Progress" section of the statement, Dr. Bhat checked the box labeled "Unchanged."

67.     Dr. Bhat did not fill out the "Restrictions and Limitations" section of the statement, and wrote, "Unable to provide limitations/restrictions without a functional capacity evaluation (Patient was made aware on last visit)."

68.     Under the "Prognosis" section, Dr. Bhat answered the question "How long will those limitations apply? (estimated)" by checking the box labeled "Longer" and wrote "→ unless symptoms improve with treatment."

69.     On June 1, 2016, Jennifer Gurganis received an Attending Physicians Statement from Dr. Tew. On the Attending Physicians Statement, Dr. Tew assessed Angie's Global Level of Functioning ("GAF") at a 40, which placed her in the category of "major impairment in several areas."

70.     On June 2, 2016, Dr. Bhat performed a second medial branch nerve block on the left side of Angie's spine at the C5, C6, and C7 levels.

71.     On June 6, 2016, Jennifer Gurganus received an Employee's Statement from Angie.

72.     In the Employee's Statement, Angie wrote that the date she first noticed the symptoms of her illness was "2nd week December 2015."

73.     Angie also wrote in her Employee's Statement, "Fine one day, next morning awakened with excruciating pain in joints from neck down. Not one day since then without pain in neck and/or low back (spine)."

74.     In the Employee's Statement, next to the question, "Is your condition due to injury or sickness related to your job?" Angie checked the box marked, "No." Below that box, Angie wrote, "The extreme stress associated with my job exacerbates my condition, as explained by physicians and physical therapists to me."

75.     On June 14, 2016, Jennifer Gurganus completed an "Occupational Analysis" for Angie, in consultation with a Sun Life employee or agent, Sandra Boyd, MS, CRC, CDMS.

76.     The Occupational Analysis cites "ERI's occupational database" in stating that Angie's occupation corresponds to Lobbyist.

77.     Upon information and belief, the "ERI" cited by Ms. Gurganus is the Economic Research Institute.

78.     Ms. Gurganus states in her analysis that Angie's "occupation typically exists in the national economy, according to ERI, at a Sedentary exertion level." Ms. Gurganus also states that for Angie's occupation that, "Standing and walking would be required for brief periods."

79.     On June 16, 2016, Angie spoke with Adam Love, CFE, Field Consultant for Sun Life. Angie told Mr. Love that she had just received a cervical nerve ablation and that she was nauseated and dizzy. Angie also said that her doctors believe they do not know the cause of her spine problems and that Dr. Flick was sending her to a neurologist for further evaluation.

80.     On June 29, 2016, Mr. Love met with Angie at her house and conducted a recorded interview.

81.     Mr. Love noted that Angie's house was clean. Mr. Love observed that Angie had a hard time turning her head to the left, appeared stiff when transitioning to a standing position, and slurred her speech at times.

82.     Mr. Love wrote a report detailing his meeting with Angie. The facts of Angie's symptoms and treatment recorded by Mr. Love, as told by Angie, were consistent with the facts and findings of several different doctors and other medical providers found in Angie's medical records.

83.     Angie told Mr. Love that she suffered from flu-like pain, "times 50" that is worse than the pain of childbirth, and that she suffered from nausea that accompanied daily spikes in her pain level.

84.     Angie told Mr. Love that she had experienced a pain level of 10 on a 10 scale that morning and had considered going to the hospital because her pain was so severe.

85.     Angie told Mr. Love that she experienced daily, stabbing pain in her neck that radiated down into her shoulder blade.

86.     Angie also told Mr. Love that she experienced aching pain in the lumbar and sacral areas of her spine.

87.     Angie told Mr. Love that she had been experiencing either of both of these types of pain daily since December 15, 2015.

88.     Angie also told Mr. Love that she was a workaholic and had lived a stressful life. Angie said that she had seen her psychiatrist twice a year prior to December 15, 2015, but that she now has appointments with her psychiatrist every 6 weeks.

89.     Angie told Mr. Love that her activities were severely restricted by her pain, that she has to spend time sleeping during the day, and that her pain prevented her from concentrating enough to perform her job adequately.

90.     Angie told Mr. Love that she was still involved with her work, to the extent of checking emails and helping find her replacement at the firm. Angie also told Mr. Love that she did meet with one client who only wanted to work with her in May 2016. Angie said that after that 4-hour meeting her neck and lower back were throbbing in pain and that she realized then that she would never be able to return to working as a lobbyist unless she recovered from her symptoms.

91.     Angie told Mr. Love that her job involved very long hours and constant work, especially when the legislature was in session, travelling to the legislative building and elsewhere in Raleigh to meet with clients and legislators, and travelling to clients' officer as part of her communications responsibilities.

92.     On June 29, 2016, Bonnie Schafer, a licensed social worker, submitted a review of Angie's psychiatric records to Jennifer Gurganis of Sun Life.

93.     Sun Life paid Ms. Schafer for this review.

94.     Ms. Schafer paid opinion was that there was no clinic evidence to support the GAF of 40 assigned to Angie by Dr. Tew. This opinion follows Ms. Schafer's listing of Angie's symptoms Dr. Tew documented; specifically, tension, sleep disturbance, fatigue, and panic symptoms.

95.     Ms. Schafer also stated, without providing supporting evidence, that Angie had a history of "secondary gain factors."

96.     Ms. Schafer was essentially accusing Angie of lying to Dr. Tew for some sort of secondary gain. However, Ms. Schafer did not cite any specific evidence to support her "secondary gain factors" claim.

97.     Ms. Schafer's paid review cites a lack of changes to Angie's medication regimen as proof that Angie was not suffering an incapacitating psychiatric disorder. However, Ms. Schafer noted a few sentences earlier in her review that Dr. Tew prescribed Cymbalta for Angie on November 5, 2015, after the change in Angie's health.

98.     On July 5, 2016, Dr. Flick referred Angie to Dr. Naslund at Raleigh Neurology Associates. Dr. Naslund noted that Angie had been suffering from persistent radiating neck pain and lower back pain. Dr. Naslund opined that Angie's pain was likely myofascial.

99.     On July 11, 2016, a Photofax, Inc. investigator, Lacie Cipolla, submitted the results of a Background Check Investigation of Angie to Ms. Gurganus. Sun Life ordered the secret background check without Angie's knowledge or permission. Angie had no idea this occurred until after Sun Life denied her claim and Angie requested its records.

100.    Among other things, Ms. Cipolla stated that her background check of Angie revealed that:

    a.  There was no evidence that Angie had any secondary employment or home-based businesses;

    b.  Angie and her husband owned a boat;

    c.  Angie had a gym membership to ClubWorx in Fuquay Varina, NC;

    d.  Sun Life searched Angie's husband and daughter's Facebook accounts, without asking for any permission, and that these unauthorized searches confirmed Angie's story because these social media accounts mentioned that Angie was sick;

14

e.  A further unauthorized social media search that showed that Angie responded to a friend's Facebook post by stating that Angie was having spine issues;

f.  Angie enjoys spending time with her family;

g.  An unnamed investigator spoke to some of Angie's neighbors, without telling Angie or asking her permission. At least one of these neighbors confirmed Angie's story by stating that Angie had been unable to work for the past couple of months, that Angie was on medical leave from Ward and Smith, P.A. due to spine issues, specifically arthritis and disc degeneration, that Angie had had a couple of recent procedures done, and that Angie had to leave work in March to focus on her health;

h.  Angie is on the board of directors for the Triangle Area Chapter of the American Red Cross.

101.  In spite of this surreptitious spying on Angie in violation of her privacy and speaking to people who know Angie without permission, and, upon information and belief, using false pretenses to access at least some of this information, Sun Life found nothing that contradicted Angie's story. In fact, everything supported Angie's description of her suffering and disability.

102.  On July 13, 2016, Angie spoke with Ms. Gurganis and told her that Dr. Bhat gave her an injection two days prior but that she still suffered pain.

103.  On August 26, 2016, Dr. Donald Lee, who Sun Life paid for a report to attempt to avoid payment of the insurance Ward and Smith had purchased from Sun Life for Angie's benefit, completed an "Independent Peer Review" that he claims consisted of reviewing Angie's medical records. Dr. Lee also claims that he made three attempts to reach Dr. Bhat, but was unable to do so.

104.    Upon information and belief, Sun Life paid Dr. Lee to obtain a favorable opinion. He never even tried to speak with, much less evaluate, Angie.

105.    Dr. Lee answered questions propounded, upon information and belief, by Ms. Gurganis or someone else from Sun Life.

106.    The first question by Dr. Lee was "1. The APS dated 5/25/16 by Dr. Bhat does not indicate specific r/ls. Does the medical documentation in the file assist with any clinical recommendations of reasonable r/ls that would have applied throughout and beyond 3/8/16 through present? In addition, please identify which conditions are causing the reported impairment?"

107.    In his response to this first question, Dr. Lee basically attempted to summarize parts of Angie's medical records and Dr. Bhat's Attending Physician Statement.

108.    In spite of the fact that Dr. Lee never saw Angie in person, or even attempted to speak with her, Dr. Lee attempted to predict Angie's restrictions and limitations.

109.    For example, Dr. Lee wrote "In an 8-hour day, the claimant has ability to sit, stand, and walk frequently."

110.    Dr. Lee's unfounded "opinion" flies in the face of all of Angie's medical records taken in part, but certainly taken as a whole. It is also entirely inconsistent with 100% of the information Angie provided to Ms. Gurganis and Mr. Love.

111.    In fact, Angie had told Mr. Love that the last time she had worked, she had a 4-hour long meeting, and that this long, seated meeting had left her in considerable pain such that she could not do it again.

112.    Quite simply, there is no credible evidence to support Dr. Lee's opinion that Angie could stand, sit, and walk frequently in an 8-hour say without experiencing excruciating and

debilitating pain. The only evidence available to Dr. Lee points to the exact opposite of this opinion. Again, upon information and belief, the only way that Dr. Lee could possibly use the information available to him to reach that opinion is if he simply wanted to ensure that Sun Life got the precise opinion it wanted and was paying him for.

113.    Dr. Lee did write that the duration of Angie's limitations was "permanent" and that her prognosis was "guarded."

114.    The second question Dr. Lee answered was, "2. Is the claimant under regular care by a physician who provides appropriate treatment and regular examination and testing in accordance with the impairing condition(s)?"

115.    Dr. Lee answered the second question affirmatively, which of course he had to do, given Angie's records. This response supports Sun Life performing the insurance contract it has with Ward and Smith for Angie's benefit.

116.    The third question Dr. Lee answered was, "Are the medically supported restrictions and limitations likely to improve and result in an increase in function? Please explain why or why not?"

117.    Dr. Lee answered the third question in the negative, which again follows given the breadth and scope of the several doctors who had said the same thing over the prior 6 months after actually seeing Angie in person. Like his response to the previous question, this response supports Sun Life performing the insurance contract it has with Ward and Smith for Angie's benefit.

118.    The fourth question Dr. Lee answered was, "What time-frame is recommended for obtaining a medical update? Please provide specialist to follow up with as applicable."

119.    Dr. Lee answered that absent any change in Angie's condition, he recommended a follow up exam with Dr. Flick every 1-2 years. Like his response to the previous question, this

response supports Sun Life performing the insurance contract it has with Ward and Smith for Angie's benefit.

120.    So, if Sun Life truly claims to rely on Dr. Lee's response to question number one that has no support whatsoever in any of Angie's voluntary response to questions by Jennifer Gurganis, her medical records, or even the secret spying by Ms. Cipolla, Sun Life is basically fabricating an excuse to shirt its contractual obligations to Angie. Sun Life took Ward and Smith's money for years, and now that it is time to perform its duty, it pays people to create bogus opinions in a ham-handed attempt to avoid its duty.

121.    On August 30, 2016, Ms. Gurganis wrote a letter to Jessica Denoyer at Ward and Smith stating that Sun Life denied Angie's Long Term Disability Claim and that it sent Angie a letter providing the details of the denial.

122.    On August 30, 2016, Jennifer Gurganis spoke with Angie and told her that her the Sun Life denied her claim. Ms. Gurganis told Angie that her, "physical impairment does not rise to a level as to restrict her from performing the material and substantial duties of her own sedentary occupation. Additionally, the records do not support her psychiatric complaints rise to a level of an impairing psychiatric disorder."

123.    Ms. Gurganis sent Angie a letter dated August 30, 2016, regarding the denial of her Long Term Disability Claim. Ms. Gurganis cited some of the Group Policy Definitions and quoted the Occupational Analysis she had created on Angie.

124.    In her letter, Ms. Gurganis concluded that, after an analysis of Angie's medical records, Angie, "would not be prevented from performing the material and substantial duties of any occupation on a full or part time basis."

18

125. Apparently, Ms. Gurangis based Sun Life's denial on Dr. Lee's written opinion based on a review of Angie's medical records. Of course, Dr. Lee's opinion, by any fair reading, actually should have led Ms. Gurganus and Sun Life to grant Angie's request. Dr. Lee's responses to the four questions, even when one considers the lack of foundation or any support for his response to the first question, still show that Angie suffered from unrelenting physical and mental disabilities that precludes her from doing her job. Thus, Sun Life's attempt to fabricate a reason to deny her claimed failed by its own paid agent's opinions. In spite of this, Sun Life ignored the only logical conclusion and denied her claim anyway.

126. Angie appealed Sun Life's initial denial of her claim.

127. On September 14, 2016, Sun Life responded to Angie's appeal in writing, and again denied her claim.

128. In the September 14, 2016, denial letter, Christine R. Smith, a Sun Life employee, wrote that "Following a complete review of all of the available medical evidence, the Behavioral Health Consultant opined that

129. On February 21, 2017, Angie appealed this second denial in writing. Her appeal contained letters of support from Dr. Bhat, Dr. Tew, and Dr. Flick. They all opined that Angie could not function in or perform the duties of her job.

130. On February 22, 2017, Dr. David Yuppa, a psychiatrist, submitted a report to Susan Everhart at Sun Life.

131. Sun Life, through a company named R3 Continuum, paid Dr. Yuppa for his report.

132. Dr. Yuppa reviewed a selection of Angie's medical records and claim documents provided by Sun Life.

133. Dr. Yuppa stated in his paid report that Angie's "medical evidence does not support the presence of functional impairment resulting from a psychiatric condition for the timeframe of 3/8/16 – 2/16/17."

134. Dr. Yuppa never met Angie.

135. Dr. Yuppa never contacted Dr. Tew.

136. On February 28, 2017, Michael R. Epperson, Executive Director and Chief Operating Officer of Ward and Smith, wrote a letter to Sun Life in support of Angie's disability claim.

137. Mr. Epperson summarized Angie's history at Ward and Smith, including the outward manifestation of her pain symptoms beginning in late 2015. Mr. Epperson stated that he believed that, with his understanding of the requirements of Angie's position, that Angie was unable to meet her work obligations due to her medical disability.

138. On March 6, 2017, Ralph Gilpatrick submitted an "Occupational Analysis – Appeals Addendum" to Susan Everhart at Sun Life. This report was a re-review of Sandra Boyd's June 14, 2016, analysis.

139. Mr. Gilpatrick's analysis of Ms. Boyd's report stated, "it appears that her job's physical requirements may have exceeded the specific physical demands referenced in the Occupational Analysis completed by Ms. Boyd."

140. Mr. Gilpatrick was saying that Ms. Boyd was wrong in her analysis.

141. Mr. Gilpatrick then analyzed the mental demands of Angie's job, which were completely ignored by Ms. Boyd in her report, as well as in Sun Life's denials of Angie's claims.

142.    On March 22, 2017, at Sun Life's request, Angie travelled to the office of David Kishbaugh, D.O. Dr. Kishbaugh summarized Angie's medical records, listed her medications, and met with her for a brief examination.

143.    In his examination of Angie, Dr. Kisbaugh noted that she appeared in moderate distress, that her mood was labile, and that her affect is consistent with her mood.

144.    Dr. Kishbaugh also observed that Angie has pain with rotation and side bending, tenderness over her cervical and lumbar facet joints, tenderness over her sacroiliac joints, a slow gait, and poor balance.

145.    Dr. Kishbaugh remarked that Angie exhibited no exaggerated pain behaviors.

146.    Dr. Kishbaugh listed his impressions of Angie's medical condition as follows: "1. Chronic pain. 2. Cervical spondylosis. 3. Lumbar spondylosis. 4. Myofascial pain. 5. Depression/anxiety."

147.    In response to the question, "Please identify any and all of the claimant's functional impairments and provide the objective basis for making your determination, noting clinical findings, testing results, etc," Dr. Kishbaugh wrote, "See functional status and limitations to functional activities sections. Physical examination section documents pain and limitations with movements. Review of medical records document radiographic findings."

148.    In response to the question, "Are there any physical conditions supported by your examination and/or clinical evidence that are functionally impairing? Please explain," Dr. Kishbaugh wrote, "Spinal arthritis (spondylosis) results in pain and limitations in motion and may also result in neuropathic findings such as numbness and weakness. These diagnoses are functionally impairing."

149.     In response to the question, "If functional impairment is supported: outline how this would translate into limitations and restrictions. Does the medical data support that claimant has remained functionally impaired since March 8, 2016 to the present? If not, please specify the timeframe that functional impairment is supported," Dr. Kishbaugh wrote, "The medical record provided include information through July 2016. Based on the available records, the patient continued to have pain complaints and physical examination findings consistent with spinal spondylosis. She also has physical examination findings consistent with her diagnoses during examination."

150.     In response to the question, "Please comment on any inconsistencies found within the available information. Describe the treatment plan for the impairing conditions and explain if the plan is consistent with the standard of care," Dr. Kishbaugh wrote, "No inconsistencies were noted within the medical records provided. Her treatment plan (medication management, therapy, counseling, injections prn) has been consistent with the standard of care for those conditions."

151.     In response to the question, "Please comment on whether the claimant's medications are causing side effects," Dr. Kishbaugh wrote, "She reports some sedation with her medications."

152.     In response to the question, "Are there modifications or additional treatment options that could be considered for the above conditions? Please explain," Dr. Kishbaugh wrote, "No alternative or additional treatment options are recommended."

153.     In response to the question, "Please comment on the claimant's compliance and/or noncompliance with the treatment plan. Please provide rationale," Dr. Kishbaugh wrote, "Based on the medical records, it appears that the patient is compliant (attends appointments and takes medications as prescribed) with her treatment plan."

154.    Dr. Kishbaugh's assessment of Angie's condition and functional impairment are accurate and support Angie's assertion that she is disabled.

155.    Dr. Kishbaugh believed that Angie's symptoms and treatment were consistent with her diagnosed conditions.

156.    On April 12, 2016, Dr. Ricky Lockett sent a medical record review to Susan Everhart of Sun Life.

157.    Ms. Everhart had ordered the review from a company called Network Medical Review, despite having received the reviews from Dr. Lee and Dr. Kishbaugh that supported Angie's disability claim.

158.    Dr. Lockett, who Sun Life paid though Network Medical Review for his opinion, reviewed a selection of medical records sent by Sun Life.

159.    Dr. Lockett's paid opinion was that there was no evidence to support any of Angie's impairments, physical restrictions, or limitations.

160.    Dr. Lockett's paid opinion was that Angie was able to perform unrestricted full time work.

161.    Dr. Lockett never examined Angie.

162.    Dr. Lockett did not address Angie's mental health diagnoses.

163.    Dr. Lockett's paid opinions are qualified with the phrase, "From a pain medicine standpoint…" However, Dr. Lockett never spoke with Angie about her pain.

164.    Dr. Lockett's paid opinions are contrary to those of Angie's treating physicians.

165.    Dr. Lockett's paid opinions are contrary to those of Dr. Lee and Dr. Kishbaugh.

166.    On April 26, 2017, Sun Life denied Angie's claim in writing a third time, despite this evidence supporting Angie's claim that she is totally disabled and unable to perform the duties

of her job. In that written denial, Susan Everhart, Senior Consultant for Defendant Sun Life, relied on the opinions of Sun Life's paid consultants and not the physicians who had been treating Angie for more than a year.

167.    Since Sun Life's third and final denial, Dr. Tew has diagnosed Angie with Complex PTSD related to her medical issues and associated pain, her inability to work and the loss of her career, the effects of her stressful career, and other stressful situations in her life.

168.    Angie continues to receive treatment for her physical symptoms from Dr. Bhat and Dr. Flick. Angie's health has not improved despite her diligent attempts to get better. She still cannot work, and has not had any income, to include disability insurance payments she should have received from Sun Life since December 2015.

## CLAIMS FOR RELIEF

## COUNT I – ERISA 502(a)

169.    The allegations contained in the Paragraphs above are incorporated by reference.

170.    The Policy states that disability income benefits are, "benefits paid to you to partially replace your income if you become Disabled while insured."

171.    The Policy also states that, "Totally Disability and Totally Disabled means during the Elimination Period and the next 24 months you are unable to perform one or more of the material and substantial duties of your Regular Occupation."

172.    The statements made by Angie's treating physicians in her medical records, as well as the Attending Physician Statements completed by Dr. Bhat and Dr. Tew, prove that Angie was Totally Disabled under the terms of the Policy as of March 8, 2016.

173.    Ward and Smith had an obligation to make reasonable accommodations for Angie to return to work, if possible. It could not due to the severity of Angie's unremitting symptoms.

Angie's inability to return to work, even with reasonable accommodations, further supports the fact that Angie is Totally Disabled under the terms of the Policy.

174.    The Dictionary of Occupational Titles listing for Lobbyist (165.017-010) contains the following activities:

    a.  Contacts and confers with members of legislature and other holders of public office to persuade them to support legislation favorable to client's interest;

    b.  Confers with legislators and officials to emphasize supposed weaknesses or merits of specific bills to influence passage, defeat, or amendment of measure, or introduction of legislation more favorable to client's interests;

    c.  Contacts individuals and groups having similar interests in order to encourage them also to contact legislators and present views;

    d.  Plans and coordinates meetings between members and elected officials to discuss legislative issues and proposals and allow officials to respond to membership concerns;

    e.  May contact regulatory agencies and testify at public hearings to enlist support for client's interests;

    f.  May attend and represent local organization at state and national association meetings; and

    g.  May instruct individuals or organization members in lobbying techniques.

175.    Despite Sun Life's assertion that Angie's occupation existed as only a Sedentary exertion level, all of these activities found in the Dictionary of Occupational Titles require at least a Light exertion level to complete.

176. With respect to a Light exertion level, The Dictionary of Occupational Titles states: "Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. **Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree**; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible."

177. Sun Life has relied on a narrow reading of a generic job description and has not evaluated Angie's claim in light of the actual responsibilities placed upon her by her position. This is borne out by Mr. Gilpatrick's report that was critical of Ms. Boyd's initial analysis of Angie's work responsibilities.

178. Angie had to travel, stand, and walk with clients and folk she attempted to lobby. All of this requires much more than a sedentary, "sitting at a desk in an office job." To suggest otherwise, Sun Life is either willfully ignoring the nature of the job or incapable of synthesizing all of the information it gathered in its investigation. Either way, Sun Life cannot simply ignore the facts any longer in light of this lawsuit. The Court should reject Sun Life's self-serving attempt to skirt its already paid for contractual obligations by an overly simplistic and factually unsupported reading of some staid governmental definition of Angie's job.

179. Aside from the job classification ruse, Sun Life has not even considered Angie's mental health condition in denying her claim.

180.     When taken in totality, which Sun Life has willfully failed to do, Angie's physical and mental conditions have rendered her disabled and functionally unable to complete her the obligations of her job.

181.     Sun Life has breached its contractual obligations under the policy by failing to pay long-term disability benefits to Angie.

182.     Angie has been damaged by Sun Life's breach of contract in the amount of $539,535.79.

<u>**COUNT II – ERISA § 502(c)(1)**</u>

183.     The allegations contained in the Paragraphs above are incorporated by reference.

184.     Angie requested a copy of her claim file via email on September 9, 2016.

185.     Angie, through her attorneys, requested a copy of:

a.   All plan documents under which the plan is established or operated; including but not limited to, the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, any other related instruments.

b.   The entire claim file for Angie's claim or claims, including but not limited to, all internal correspondence, all correspondence sent to Mrs. Harris, all correspondence sent to Ward and Smith, P.A., all correspondence with any medical provider or Independent Medical Examiner, and all notes of phone conversations with any individual regarding this claim.

186.     To the extent that Sun Life has not provided the requested documents, in violation of ERISA regulations, Sun Life is responsible for a penalty of up to $110 per day for its failure to do so.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays this Honorable Court that she have and recover judgment against the Defendant, jointly and severally, as follows:

1.      Compensatory damages in the amount of $539,564.85;

2.      A penalty of $110 per day against Sun Life for the appropriate number of days that it failed to produce records it was supposed to produce;

3.      Interest, costs, as allowed by law;

4.      Attorney's fees pursuant to 29 U.S.C. § 1132(g)(1);

5.      For a jury trial on all issues so triable; and

6.      For any and all further relief as to the Court may seem just and proper


This the 29th day of June, 2018.

KNOTT & BOYLE, PLLC


BY:    /s/ Benjamin Van Steinburgh
        Benjamin Van Steinburgh
        NC Bar No. 44869
        W. Ellis Boyle
        NC Bar No. 33826
        4800 Six Forks Road, Suite 100
        Raleigh, NC  27609
        Telephone: (919) 783-5900
        Facsimile:  (919) 783-9650
        Email: ellis@knottboyle.com
              ben@knottboyle.com
        *Attorneys for Plaintiff*